347 P.2d 184

SPANISH FORK WEST FIELD IRRIGA-
TION COMPANY, a corporation, et al.,
Plaintiffs and Respondents,

v.

UNITED STATES, a nation, et al.,
Defendants,

State Engineer of the State of Utah,
Appellant.

No. 8994.

Supreme Court of Utah.

Dec. 9, 1959.

Walter L. Budge, Atty. Gen., Robert B. Porter, Jr., Deputy Atty. Gen., for appellant.

Elias Hansen, Salt Lake City, Christenson, Novak, Paulson & Taylor, Provo, for respondent.

A. Pratt Kesler, U. S. Atty., Salt Lake City, for defendant United States.

WADE, Justice.

Plaintiffs represent the water users of the five original canal companies which were the first appropriators of the waters of the Spanish Fork River. They seek a declaratory judgment that their rights to use up to 390 cubic feet per second of the

Spanish Fork River water are prior to the rights of the United States. They also seek a declaration that under their contracts with the United States for supplemental waters from the Strawberry Valley Reservoir that the High Line Canal water users, whose only source of water supply is the government appropriated high waters of the Spanish Fork River and the storage waters of the Strawberry Valley Reservoir, must, as against the plaintiffs have credited on their contracts for water from the government, all the water which they receive both from the Spanish Fork River and the reservoir.

Practically all the users of the Spanish Fork River waters have contracts with the government to use government appropriated waters from the reservoir. More than half of the water users of this project receive part of their supply of government appropriated waters from the Spanish Fork River. There are hundreds of water user government contracts each specifying a limit to the number of acre feet which the government agrees to furnish to such water users annually. Usually the limit is two acre feet per acre, with some contracts specifying more and some less than that amount. The government has fixed an over-all limit to the number of acre feet per season which it would contract to deliver but the amount actually contracted to be delivered is less than such fixed amount.

The Strawberry Reservoir storage capacity exceeds 270,000 acre feet. The amount of water available for storage in the reservoir fluctuates greatly from year to year. The smallest recorded supply was 8,153 acre feet for 1934, and the largest was 153,668 acre feet for 1952, with an average annual yield of 61,688 acre feet from 1913 to and including 1955. Only 13 years during that period of 42 years has the project failed to deliver 100% of the water called for under these contracts. Such years were 1932 through 1945, except in 1939, when 100% delivery was made. The plaintiffs' project water supply comes exclusively from the reservoir and of course they cannot complain about how the water is charged on defendants' contracts as long as 100% of the water contracted for is delivered. However, during the years when 100% of the water contracted for is not available if defendants' contracts are not credited with the full amount of the water which they receive from the river then the defendants will take a larger share of the reservoir waters and the amount available to plaintiffs from the reservoir will to that extent be reduced.

From 1926 to the present time the Water Users Association, an organization of the water users of the waters of this project, has managed the project under a contract with the United States. Nine of the 16 directors of the association are elected from districts made up of defendants' interests.

Because of the great number of interested parties plaintiffs sue as representatives of a class and join the defendants as representatives of the opposing class.[1] Among the defendants is the United States which built and still owns the reclamation project, some governmental executive officers connected with the project, the Strawberry Water Users Association, High Line Canal Companies, the Utah State Engineer and others, some of whose interests were the same as plaintiffs but who refused to join as plaintiffs.[2]

The trial court refused to dismiss the case against the United States, or its officers. It held that plaintiffs' rights to use up to 390 second feet of the Spanish Fork River water are prior to the rights of the United States. It refused to require that full credit be charged against defendant water users for all Spanish Fork River waters used by them under contracts with the United States. It made a formula by which such charge should be determined. It required the State Engineer to make certain estimates and regulations and retained jurisdiction of the matter for 10 years.

The defendants appeal and the plaintiffs cross-appeal. Defendants contend 1) that the finding that plaintiffs have up to 390 second feet prior right to the use of Spanish Fork River waters is not supported by substantial evidence, 2) that the United States is immune from this suit, 3) that the trial court correctly held that the defendants should not be charged with all the waters they use from Spanish Fork River, 4) that the formula for determining the defendants' charge for river waters used is not related to the contract and usurps an executive function, 5) that the court's directions to the State Engineer were erroneous, and 6) the court erred in retaining jurisdiction for 10 years. We consider these contentions in the order named.

1) The evidence supports the finding that plaintiffs have priority in the use of up to 390 second feet of Spanish Fork River waters. Plaintiffs allege and originally defendants admitted that the United States had by express contract with each plaintiff canal company recognized the priority of plaintiffs to the river waters amounting to a total of 390 second feet. During the trial defendants amended their answers to deny such allegations. These denials were based on the McCarty decree of 1899 and the Booth decree of 1901, which adjudicated only 243 second feet of the Spanish Fork River to plaintiffs.

A contract between each plaintiff canal company and the United States made at the beginning of the operation of this project was introduced in which the United States expressly recognized the validity

1. See Rule 23, Utah Rules of Civil Procedure.

2. See Rule 19, Utah Rules of Civil Procedure.

of plaintiffs' claims. Testimony was also received that throughout the entire operation of the project the United States had recognized the validity of plaintiffs' prior claims to the use of this river water up to 390 second feet. The record discloses no evidence to the contrary. This finding was reasonable and is affirmed.

■ 2) The United States is not immune from this action. 43 U.S.C.A. § 666 provides:

"Consent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances:

Provided, That no judgment for costs shall be entered against the United States in any such suit."

This is a clear consent of the United States to the maintenance of this suit. It is clearly an adjudication of the rights to use the waters of a river system. It also is a suit for the administration of such rights, and here the United States is the owner of water rights of this system and is a necessary party to this action. We conclude that the United States has consented to this action.

■ 3) The court correctly held that the defendant water users need not be charged the full amount of the water which they use from the river. The defendants, appellants here, agree with the above proposition but plaintiffs, cross-appellants here, strenuously disagree therewith. Their disagreement is based on the fact that the government expressly limited the number of acre feet of water it would contract to furnish to all water users from this project and the following or similar provision is in all the contracts between the government and water users for the furnishing of project waters:

"The quantitative measure of water right hereby applied for is that quantity of water which shall be beneficially used for the irrigation of said irrigable land up to, but not exceeding two (2) acre feet per acre per annum, measured at the head of Strawberry

High Line Canal, and in no case exceeding the share proportionate to irrigable acreage of the water supply actually available as determined by the Project Manager or other proper officer of the United States, or its successor, in the control of the project during the irrigation season for the irrigation of the lands under said unit."

This limitation that the water supplied to the water users shall "not exceed 2 acre feet per acre per annum" and shall in no case exceed "the share proportionate to irrigable acreage of the water supply actually available" with over-all limit to the amount of acre feet which the government would contract to supply from the project indicates an intention that each project water user is entitled to his proportionate share of the water supply for each year. This construction, if there were no other factors, would, in fairness to plaintiff water users, require that all the water used by the defendant water users both from the river and the reservoir be credited as a part of the water which the government contracted to furnish to them. It would reduce the amount of water available for the plaintiff water users who use only reservoir waters from this project, if the water which defendant water users use from the river were only partly counted as a part of the water which the government contracted to supply to them. This

is especially true of years when the full contract water supply is not available, and it would reduce the reservoir supply for future years even in years when the full supply was furnished.

Usually for a short time each spring there is more water in the Spanish Fork River than is beneficially used. There is no reservoir or other means of storing these runoff waters. Often a part of such surplus water is diverted into the canals for cleaning purposes to wash moss, silt and debris out of the canal. Such water which is not actually used for irrigation of his land of course cannot be counted as a part of the government contract water supply furnished to a defendant water user.

Some years the river threatens or actually reaches flood proportions, creating a flood control problem. As a flood control measure the canals are filled and the water users are urged to divert the water onto their lands if they can do so in safety, though the land may be already saturated from storms. Water used as a flood control measure should not be counted as water furnished from the project under government contracts.

Finally there is the situation of an ample supply of water in the river and not much need for water on the land. If as much of the river water as can be benefi-

cially used is used as long as the supply lasts the demand for reservoir water will thereby be delayed and the total amount of reservoir water required reduced. This will make a saving of reservoir water to the benefit of all concerned. The reservoir water which can be used after the high water has subsided is much more valuable than the river runoff water when there is more than enough. By reducing the price of the surplus river water and by not counting the full amount used as a part of the amount to be furnished to the water users under the government contracts more river water may be used and less reservoir water required. Under such circumstances when there is evidence that a saving of reservoir water may thereby be effected the project management could offer such reductions to the water users in order to effect a saving of the reservoir water. Such action, if held to reasonable limits would benefit both plaintiffs and defendants. For the purpose of saving reservoir water the project management is authorized to reduce these charges.

4) The court's formula for reducing these charges would seem to handicap the management rather than be useful. The time when the credit for water used should be reduced requires good judgment and sound discretion, in the light of all available knowledge of the facts and circumstances. This cannot be produced by a formula. Such reduction is permissible only for the purposes above approved and when there is a reasonable certainty that such purposes will thereby be accomplished.

5) No good reason is shown for taking from the United States and the project management certain engineering functions and giving them to the State Engineer. No doubt these two departments should work together. But the decreed change made is not justified.

6) No justification for the court retaining jurisdiction is shown. Both sides object thereto. That provision should be eliminated.

Reversed, with directions to enter judgment in accordance with the views herein expressed.

No costs awarded.

CROCKETT, C. J., and McDONOUGH and CALLISTER, JJ., concur.

HENRIOD, Justice (concurring and dissenting).

I concur, save for the conclusion that the U. S. waived its immunity. The petition and its prayer clearly envision a cause seeking a declaration that the administrators, (not the U. S.) for the use of the subject water, should charge early spring runoff water users 100% of the spring wa-

ter they used against their later-season contracted, permanent reservoir water rights. The U. S.' appropriated rights were admitted and unassailed. No conflict was asserted between it and any other appropriator. No allegation suggested any design to compel an adjudication of the rights of the U. S. There was no contention that the U. S. was an administrator of rights or that it objected to any existing administration thereof. The petition's prayer does not hint that the U. S. was a "necessary party" as that phrase connotes. From a casual reading of 43 U.S.C.A. § 666, it seems obvious that the U. S. did not waive its sovereign immunity.